Argued April 25, affirmed June 16, reconsideration denied
July 23, petition for review denied September 3, 1975

STATE OF OREGON, *Respondent v.* ROBERT
JUNIOR WRIGHT (No. 88063 & 88064), *Appellant.*

537 P2d 130

*Jon S. Henricksen,* Oregon City, argued the cause for appellant. On the brief were Thom and Henricksen and Ronald D. Thom, Oregon City.

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for respondent. With him on the brief was Lee Johnson, Attorney General, Salem.

Before SCHWAB, Chief Judge, and FORT and LEE, Judges.

LEE, J.

Defendant-bartender paid cash for "free games" won on an electric amusement device and was convicted of promoting gambling in the second degree, ORS 167.122.[1] Defendant contends that the trial court erred in: (1) denying his motion for a directed verdict of acquittal; (2) overruling his motion to suppress evidence; and (3) finding that the gambling device was subject to forfeiture and destruction under ORS 167.162. We affirm.

On June 19, 1974, a Portland police officer, dressed in plain clothes, went to a tavern and operated an electric amusement device. The defendant was present at the time and gave the officer change in quarters to operate the machine. The machine has a screen with six horizontal rows of symbols in the form of animals, with four windows across, thus forming four vertical columns. By inserting a quarter and flipping a

---

[1] ORS 167.122 provides:

"(1) A person commits the crime of promoting gambling in the second degree if he knowingly promotes or profits from unlawful gambling.

"(2) Promoting gambling in the second degree is a Class A misdemeanor."

handle, the player activates the machine. Points for "free games" are achieved on the interplay of two factors: first, the number of animal pictures that appear in the row for that animal; and second, the horizontal row in which the pictures appear. On about his third flip of the handle, the officer scored eight points and defendant told him that each point was worth 25 cents. Defendant then gave the officer $2, made a notation in a little black notebook (State's Exhibit 1) and asked if the officer would like to play further. The officer declined.

On June 28, 1974 the same officer returned to the tavern, this time accompanied by a second officer. The first officer began playing the same machine. This time it required eight quarters to produce two points. When the officer notified defendant of the score, he paid the officer 50 cents and made a notation in the aforementioned black book.

## Knowledge of Illegality

■ The defendant's first assignment of error is the trial court's denial of his motion for acquittal. In support of this assignment, defendant contends that (1) ORS 167.122 requires that a defendant know that the gambling he is promoting is illegal whereas, (2) there was no evidence of this. The second of these contentions obviously has no application unless we sustain the first. This we decline to do.

To support the first allegation, defendant cites ORS 161.095(2) which reads as follows:

"Except as provided in ORS 161.105, a person is not guilty of an offense unless he acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state."

That statute does not address itself to whether conviction requires that the defendant know that what he

does is illegal. On the other hand, ORS 161.115(4) is dispositive of defendant's contention. It provides:

"Knowledge that conduct constitutes an offense, or knowledge of the existence, meaning or application of the statute defining an offense, is not an element of an offense unless the statute clearly so provides."

Accordingly, it was not necessary that defendant have actual knowledge that what he did was illegal to sustain the conviction.

### Warrantless Seizure

■ The defendant's second assignment of error is based on the trial court's denial of the defendant's motion to suppress evidence seized during the officer's second visit because:

(a) the *seizure* was made without a warrant (defendant concedes there was no search);

(b) there were no exigent circumstances; and

(c) there was no preceding arrest to which the seizure might be incidental.

Defendant relies on Art I, § 9 of the Oregon Constitution which reads:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* search, *or* seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, *and* the person or thing to be seized." (Emphasis supplied.)

Defendant calls attention to the disjunctive phrasing of the first part of the section (i.e., "* * * unreasonable search, or seizure * * *") and contends that a warrant is therefore necessary for a seizure without a search. We disagree.

■ The defendant does not contend that all warrantless seizures are unreasonable; indeed, there are

certain well-recognized exceptions authorizing a warrantless search and seizure, two of which the defendant has implicity recognized: e.g., exigent circumstances and search incident to a lawful arrest. Another such exception is the plain-view rule, which authorizes seizure of evidence of crime which is within the unimpeded view of the officer when the officer is positioned where he has a right to be. *State v. Sagner,* 12 Or App 459, 472, 506 P2d 510 (1973); *State v. Alexander,* 9 Or App 42, 46, 495 P2d 51 (1972); *State v. McGee,* 7 Or App 574, 578, 492 P2d 489 (1972).

■ The United States Supreme Court has also recognized the plain-view doctrine construing the fourth amendment. *Coolidge v. New Hampshire,* 403 US 443, 465, 466, 91 S Ct 2022, 29 L Ed 2d 564 (1971); *Harris v. United States,* 390 US 234, 236, 88 S Ct 992, 19 L Ed 2d 1067 (1968). In *Harris,* the United States Supreme Court held that:

"* * * It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. Ker v. California, 374 US 23, 42-43 (1963); United States v. Lee, 274 US 559 (1927); Hester v. United States, 265 US 57 (1924)."

Since in this case the officers had a right to be where they were at the time of the seizure, the seizure was lawful.

■ Both Amendment IV to the United States Constitution and § 9 of Art I of the Oregon Constitution have as their purpose the protection of those areas where the individual has some reasonable expectation of privacy from unauthorized government intrusion— the interest protected is an interest in privacy rather than a property interest in the thing seized. In the case before us, there has been no invasion of privacy; the premises were open to the public. The officers

simply seized the alleged contraband which was in open view.

## Gambling Device

■■ Defendant's final assignment of error is that the trial court erred in finding that state's Exhibit 2 (the machine) was a gambling device subject to forfeiture and destruction under ORS 167.162 which provides, in part, that:

"(1) A gambling device is a public nuisance. Any peace officer shall summarily seize any such device that he finds and deliver it to the custody of the sheriff, who shall hold it subject to the order of the court having jurisdiction.

"(2) Whenever it appears to the court that the gambling device has been possessed in violation of ORS 167.147, the court shall adjudge forfeiture thereof and shall order the sheriff to destroy the device and to deliver any coins taken therefrom to the county treasurer, who shall deposit them to the general fund of the county.

"* * * * *."

We find that the trial court properly applied the statute to the apparatus in question. ORS 167.117(4) states, in part that:

"'Gambling device' means any device, machine, paraphernalia or equipment that is used or usable in the playing phases of unlawful gambling, whether it consists of gambling between persons or gambling by a person involving the playing of a machine. * * * Amusement devices which do not return to the operator or player thereof anything but free additional games or plays shall not be considered to be gambling devices."

The state relies on the first portion of ORS 167.117(4) and the defendant relies on the latter portion. We believe that defendant's reliance on the exclusion is misplaced. It is the use to which the machine is actually

put that is determinative of its character as a gambling device. *State v. Fuller,* 164 Or 383, 385-86, 101 P2d 1010 (1940); *Enloe v. Lawson,* 146 Or 621, 628, 31 P2d 171 (1934); *Smith v. One Super Wild Cat,* 10 Or App 587, 590, 500 P2d 498 (1972). These cases were decided on facts arising before the enactment of the exclusion on which the defendant relies, but the proposition for which we cite the foregoing cases is equally valid today.

■ The exclusion, which was added to ORS 167.-117(4), was enacted in 1971 as part of the comprehensive revision of the substantive criminal law made that year.[8] We find no evidence in the legislative deliberations that "free-play" pinball machines which, as here, were in fact used and possessed as payoff gambling devices, are to be immune from ORS 167.162 seizure. Indeed, the contrary is affirmatively indicated.[9] The legislative history of ORS 167.117(4) per-

---

[8] The exclusion arose in the form of an amendment to Senate Bill 40. The exclusion was adopted by the Senate Committee on Criminal Law and Procedure on April 2, 1971. *See* the minutes (page 3) of the Committee's hearing for that date. The purpose of the exclusion was to re-enforce, in affirmative form, a previous amendment adopted by the Committee March 30, 1971 to what is now ORS 167.117(12). The March 30th amendment removed free-game machines from the definition of "something of value." This had the effect of removing the use of such machines from the definition of "gambling" as used in the present ORS 167.117(3). *See* (1) the Committee minutes (page 2 and Exhibit C) and audio record of the hearing conducted March 30, 1971, (2) pages 101-103 of the printed Senate Bill 40, as introduced, and (3) the minutes (page 3) and the audio record of the Committee's hearing of April 2, 1971.

[9] In his appearance before the Committee, Mr. Donald L. Paillette, Project Director of the Criminal Law Revision Commission, commented that "Our section here talking about seizure and destruction of gambling devices, would include, even under their amendments [the so-called "Steelhammer Amendment" which included in it the identical language of the exclusion which the defendant relies on in the instant case] it would include a pinball machine that paid off, *a machine used for* unlawful gambling." (Emphasis supplied.) *See* the audio records for the Committee's March 30, 1971 hearing.

suades us that the legislature meant that: (1) free-play amusement devices are not *per se* gambling devices subject to an ORS 167.162 seizure, but (2) those machines which are *mechanically* free-play "amusement devices" but *used* as gambling devices under ORS 167.117(4) are subject to seizure. The seizure in the instant case is also supported by the definition of "slot machines" in ORS 167.117(10).[⊕]

Affirmed.

SCHWAB, C. J., concurring in part and dissenting in part.

I concur in affirming defendant's conviction for promoting gambling. I dissent from that portion of the majority opinion that interprets ORS 167.117 (4) to hold that a free-play pinball machine can be subject to forfeiture as a gambling device.

The question of whether to prohibit free-play pinball machines was one of those relatively minor issues that consumed a major amount of the legislature's time in 1971. The Criminal Law Revision Commission proposed that such machines be outlawed. As stated by the Commission:

"*McKee v. Foster*, 219 Or 322, 347 P2d 585 (1959), held that 'lottery' contemplates a prize tangible in nature and having a value in the market place, but does not include the 'free-play' feature of a replay pinball machine. *The draft would overrule this case.*" Commentary, Proposed Oregon Criminal Code, p 258 (1970).

---

[⊕] ORS 167.117(10) provides, in part, that:

" 'Slot machine' means a gambling device that as a result of the insertion of a coin or other object operates, either completely automatically, or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value *or otherwise entitle the player to something of value.* * * *" (Emphasis supplied.)

The Commission explained that its proposal made free-play pinball machines illegal

> "\* \* \* because [of] the definition of \* \* \* 'gambling' which \* \* \* hinges on the possibility of receiving 'something of value' which, in turn, is defined \* \* \* to include free plays \* \* \*." Commentary, supra at 260.

Specifically, as proposed by the Commission, the definition of "something of value" included "a privilege of playing at a game or scheme without charge." Proposed Oregon Criminal Code, supra at 256.

Representatives of the amusement industry and various county officials who claimed they were dependent on tax revenues from licensing pinball machines lobbied against the Commission's proposal. Their pleas were well-received by the Senate Criminal Law and Procedure Committee. Although parliamentary maneuvering sometimes obscures the fact, as I read the Committee's Minutes for March 23, 30, 31, and April 2, 1971, it is clear that the sentiment of the Committee was that free-play pinball machines should be legal.

The Committee gave effect to this feeling by first amending the definition of something of value, now stated in ORS 167.117(12) to eliminate "a privilege of playing at a game or scheme without charge." Since the definition of gambling, now stated in ORS 167.117(3), hinges on the possibility of receiving something of value, this had the effect of legalizing free-play pinball machines.

A couple of days later the Committee adopted another amendment, critical to the disposition of the forfeiture issue in this case. As drafted by the Criminal Law Revision Commission, Proposed Oregon Criminal Code at 254, and adopted by the legislature, ORS 167.117(4), the first sentence of the definition of gambling device reads:

" 'Gambling device' means any device, machine, paraphernalia or equipment that is used or usable in the playing phases of unlawful gambling, whether it consists of gambling between persons or gambling by a person involving the playing of a machine."

The Committee, by amendment, added the following, which now appears as the last sentence of ORS 167.117(4):

"Amusement devices which do not return to the operator or player thereof anything but free additional games or plays shall not be considered to be gambling devices."

Interpreting this statutory language, the majority concludes: (1) free-play amusement devices are not per se gambling devices subect to forfeiture, but (2) those machines which are mechanically free-play amusement devices but used as gambling devices are subject to forfeiture. 21 Or App at 667.

The flaw in this analysis is that it reads the last sentence of ORS 167.117(4) out of the statute. After free-play pinball machines had been legalized by way of the amendment to the definition of something of value, ORS 167.117(12), the first sentence of ORS 167.117(4) continued to define gambling devices as machines "used" to gamble. Thus, if a machine only awarded free games, it was fully legal; but if the machine was *used* to gamble, i.e., something of value changing hands, it was illegal to possess, ORS 167.147, and subject to forfeiture, ORS 167.162. Were the first sentence of ORS 167.117(4) the only relevant statutory language, I would agree with the majority's analysis. But the legislature proceeded to add the critical last sentence to ORS 167.117(4), excluding free-play amusement devices from the definition of gambling devices. Given that the first sentence of ORS 167.117(4) provides that machines not *used* to gamble

are not gambling devices, the last sentence of ORS 167.117(4) is rendered a meaningless nonsequitur unless it was intended to mean that free-play amusement devices are never gambling devices, regardless of whether they are abused by way of cash payoffs.

Of course, the act of abuse is punishable as promoting gambling under ORS 167.122. But the only way to give *any* effect to the last sentence of ORS 167.117(4) is to hold that the legislature intended to exclude free-play pinball machines from the prohibition against possession, ORS 167.147, and the possibility of forfeiture, ORS 167.162, regardless of how they are used or abused.

In addition to giving effect to the entire statute, my interpretation is also supported by the policy consideration discussed in *State v. Welch,* 264 Or 388, 393, 505 P2d 910 (1973): in case of doubt, ambiguous penal statutes should be interpreted in favor of lenity. The same policy consideration should be applied to forfeiture statutes.

Finally, in light of the extensive favorable consideration that free-play pinball machines received, I cannot agree with the majority's suggestion that the legislature might have intended to include such machines within the definition of slot machines in ORS 167.117(10).

I would reverse the order of forfeiture.