Argued October 31, 1977, affirmed January 31, 1978

HENDRIX, *Appellant,*
*v.*
McKEE, *Respondent.*
(TC 20538, SC 25138)
575 P2d 134

William M. Holmes, Bend, argued the cause for appellant. With him on the briefs were Gray, Fancher, Holmes & Hurley, Bend.

Frank G. MacMurray, Jr., Redmond, argued the cause for respondent. With him on the brief were

Craig P. Emerson, Portland, and Clark & MacMurray, Redmond.

Before Denecke, Chief Justice, and Holman, Howell, Bryson, and Lent, Justices.

LENT, J.

## LENT, J.

■ Plaintiff is seeking damages for the alleged breach of his employment contract with the defendant.[1] The defendant interposed the affirmative defense that the contract was unenforceable as an illegal contract "contrary to the laws and public policy of the State of Oregon." The trial court, sitting without a jury, held the contract unenforceable for this reason, dismissed the complaint, and entered judgment for the defendant. Plaintiff appeals, asserting as his sole assignment of error that "[t]here was no evidence to support the memorandum opinion of the court and the subsequent judgment."[2]

■■ Our scope of review is given by the Oregon Constitution, Amended Art. VII, § 3:

"* * * [N]o fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court

---

[1] A question at trial at issue by defendant's answer was whether plaintiff's employer (and therefore the proper defendant) was defendant's corporation, Mac Electronics, Inc., or defendant personally. The trial court found it unnecessary to resolve this issue. We shall assume defendant was the proper party to this action.

[2] We might well inquire initially whether this assignment is properly before this court. It has long been the rule in this state that unless a party makes a motion for nonsuit or for a directed verdict at trial, he cannot complain on appeal that there was insufficient evidence to support a verdict against him. *See, e.g., Verret Construction Co. v. Jelco Inc.,* 280 Or 793, 795, 572 P2d 1029 (1977), and cases cited therein.

While the decided cases have involved jury trials, some members of the court see no good reason not to apply this salutary rule to law cases tried to the court. Its application would have the effect of requiring a litigant to apprise the trial judge of this contention. Upon an unfavorable ruling, the sufficiency of the evidence could be tested upon appeal. The appellate process is predicated upon the aggrieved party's establishing an *error* on the part of the trial judge. It is patently unfair to charge such error without having given the judge the opportunity to avoid it. It is incumbent upon a party who believes he should prevail on the evidence, *as a matter of law,* to advise the trial court of this belief prior to submission of the factual issues for resolution. Failure to do so should deprive that party of his right to test the sufficiency of the evidence upon appeal. Just as is the motion for a directed verdict, this is, in effect, a demurrer to the evidence. The motion where there is no jury might take the form of a motion for judgment as a matter of law. *See* 89 CJS Trial § 594.

This extension of the general rule, however, does not comport with present practice, and defendant has not raised the issue; therefore, we need not yet decide it.

can affirmatively say there is no evidence to support the verdict. * * *"

*See Shepler v. Weyerhaeuser Company,* 279 Or 477, 484, 569 P2d 1040 (1977). The findings of fact by a trial court sitting as a trier of fact have the same legal effect as a jury verdict. ORS 17.435. *See also Paul & Backer Co. v. Newman,* 252 Or 66, 68, 448 P2d 511 (1968). In our review of the evidence, we are guided by the well-established principle, most recently iterated in *Foster v. Schnell Refrigeration Co.,* 280 Or 411, 414, 571 P2d 497 (1977), that

"* * * we must view the evidence in the light most favorable to [the prevailing party], and [that party] is entitled to the benefit of every reasonable inference which may be drawn from the evidence. * * *"

From the evidence and reasonable inferences[3] therefrom, viewed in this light, the trial court could have found the following facts.

Plaintiff is an electrical engineer whose work experience was primarily in the design of gambling devices. He was president of a California corporation which specialized in the design of gambling devices used in Nevada. Later he moved to Nevada to continue his work. In 1974 plaintiff was introduced to defendant by a mutual friend who was also in the business of manufacturing gambling devices. Defendant invited plaintiff to come to Oregon in 1974 over the July 4th weekend, at which time defendant took plaintiff on a tour of defendant's placements of "amusement devices" in the Bend/Redmond area (Deschutes County).

---

[3] Counsel for the parties seem to quibble over the permissibility of various inferences to be drawn from the facts in evidence. The parameters of permissibility are given by statute. ORS 41.320 defines an inference as "a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect." ORS 41.330 gives the two grounds upon which the trier of fact is permitted to base an inference:

"(1) A fact legally proved; and,

"(2) Such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature."

These "amusement devices" were upright electro-mechanical devices sometimes known as "free play" machines.

At that time plaintiff and defendant came to an agreement[4] on employment to begin on July 15, 1974. Plaintiff was employed initially to build a "pull tab" machine, an electro-mechanical or electronic "punch-board," which plaintiff testified he knew was *not* an *amusement device* and which plaintiff knew was illegal in Oregon.

Plaintiff worked on designing this device in Nevada in August and September of 1974. In December 1974 defendant told plaintiff to move to Oregon in order to design some new upright devices similar to those plaintiff had been shown in July but with solid-state electronic components. Plaintiff moved to Oregon in January 1975 and began work on these upright de-vices. In addition, plaintiff worked on rebuilding some old upright devices at this time.

Defendant paid plaintiff $2,500 per month during his period of employment. The salary was received by plaintiff in the form of a check for $1,500 and $1,000 in cash. This latter amount was not reported on plaintiff's Oregon or Federal income tax returns for 1975.

---

[4]There is directly contradictory testimony as to the terms of that agreement. Plaintiff contends the terms of their oral agreement corre-sponded to the terms embodied in plaintiff's Exhibit 1, a written agreement which defendant drafted but, as plaintiff admits, never signed. These terms call for a two-year employment period. Defendant, on the other hand, claims the duration was indefinite. The trial court did not resolve this conflict, since it found the contract unenforceable, whatever its terms. We shall assume for the purpose of this appeal that the terms are those which are embodied in plaintiff's Exhibit 1. An issue which was raised by the facts of this case but not by defendant's pleadings was that of violation of the statute of frauds, ORS 41.580(1), which states that an agreement is void unless it is in writing and subscribed by the party to be charged if it is "[a]n agreement that by its terms is not to be performed within a year from the making." We note the issue but do not consider it on this record.

[ 127 ]

At some point in this general time frame,[5] defendant was charged with and pleaded guilty to Promoting Gambling in the First Degree, a Class C felony. The charge stemmed from defendant's involvement with "electronic upright machines" which were located in Deschutes County. The trial judge in the case at bar could infer these to be the same machines defendant showed plaintiff on plaintiff's July 4th visit.

Plaintiff was employed by defendant from July 15, 1974, through June 30, 1975. On the latter date defendant notified plaintiff of his termination effective immediately.

It is often stated that courts will not enforce "illegal" contracts. This is an oversimplification of a legal principle, the application of which often involves construction of statutes and contractual provisions, delineation and balancing of public policies, and a difficult sorting and sifting process.

If the consideration for the contract or its agreed purpose is illegal or against public policy on its face, it will not be enforced. If the contract on its face is not illegal or against public policy, as in the present case, the defendant assumes the burden of alleging and proving its illegality. *Intl. L. and W. Union v. Harvey Al. et al,* 226 Or 94, 98, 359 P2d 112 (1961). In addition, if the contract is merely promotive of activities which are either illegal or against public policy, a weighing of conflicting public policies is required. This court stated in *Eldridge et al v. Johnston,* 195 Or 379, 405, 245 P2d 239 (1952), the conflict inherent in this process:

---

[5]Neither plaintiff nor defendant introduced evidence of when defendant was convicted of promoting gambling in the first degree or when the gambling activities which led to the conviction occurred. The trial court's memorandum opinion refers to "defendant's subsequent conviction," but such a time placement is unwarranted by the record. In a case which was tried and determined on inference, these dates would have played an important part. Any inferences which may be permitted are viewed in the light most favorable to the defendant.

"In considering the contract executed by defendant, we are confronted with more than one principle of public policy. It is elementary that public policy requires that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice, and it is only when some other over-powering rule of public policy, such as the rule against perpetuities, intervenes, rendering such agreement illegal, that it will not be enforced. This rule respecting the sanctity of contracts is so firmly fixed in our system of jurisprudence that even where the agreement is partly legal and partly illegal, if the legal may be separated from the illegal, the legal part will be enforced."

■ A counterweight to the public policy of freedom of contract is the general public policy against the enforcement of illegal contracts. In *Northwest Amusement Co. v. Aetna Co.,* 165 Or 284, 288-89, 107 P2d 110, 132 ALR 118 (1940), we said:

"The rule of public policy, which prevents a recovery in court upon such an agreement, [6] is not based upon the impropriety of compelling the defendant to comply with his contract. That in itself would generally be a desirable thing. Relief is denied, because plaintiff is a wrongdoer.

" 'Courts do not wish to aid a man who founds his cause of action upon his own immoral or illegal act. * * * The court's refusal is not for the sake of the defendant, but because it will not aid such a plaintiff.' [Restatement, Contracts, § 597, p. 1110]."[7]

---

[6] *See* footnote 10.

[7] In *McMullen v. Hoffman,* 174 US 639, 669-70 (1899), the U.S. Supreme Court considered the public policy outlined above:

"We must, therefore, come back to the proposition that to permit a recovery in this case is, in substance, to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract, and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defence is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations, and in order the better to secure the public against dishonest transactions. To refuse to grant

Is this contract illegal or against public policy in the sense outlined above? ORS 167.147 states:

"(1) A person commits the crime of possession of a gambling device if, with knowledge of the character thereof, he manufactures, sells, transports, places or possesses, or conducts or negotiates a transaction affecting or designed to affect ownership, custody or use of:

"(a) A slot machine; or

"(b) Any other gambling device, believing that the device is to be used in promoting unlawful gambling activity.

"(2) Possession of a gambling device is a Class A misdemeanor."

According to ORS 167.117(10), a slot machine is defined as:

"* * * a gambling device that as a result of the insertion of a coin or other object operates, either completely automatically, or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value or otherwise entitle the player to something of value. * * *"

---

either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law."

Earlier in the case the court noted a prior example of the enforcement of this public policy:

"About the earliest illustration of this doctrine is almost traditional in the famous case of *The Highwayman.* It is stated that Lord Kenyon once said, by way of illustration, that he would not sit to take an account between two robbers on Hounslow Heath, and it was questioned whether the legend in regard to *The Highwayman* did not arise from that saying. It seems, however, that the case was a real one. He did file a bill in equity for an accounting against his partner, although it was no sooner filed and its real nature discovered than it was dismissed with costs, and the solicitors for the plaintiff were summarily dealt with by the court as for a contempt in bringing such a case before it. (1 Lindley on Partnership, 5th ed. 94, Note n; 9 Law Quarterly Review, (London) pp. 105-197)." *Id* at 654.

(We forego instigation of the contempt machinery.)

A gambling device is defined by ORS 167.117(4) as:

"* * * any device, machine, paraphernalia or equipment that is used or usable in the playing phases of unlawful gambling, whether it consists of gambling between persons or gambling by a person involving the playing of a machine. * * * Amusement devices which do not return to the operator or player thereof anything but free additional games or plays shall not be considered to be gambling devices."

■ Defendant's employment involved the design of a "pull tab" machine and a number of "upright devices." The former device was characterized by the trial court's memorandum opinion as a "gambling device." While this is certainly true, it did not go far enough, since it also should be subclassified as a "slot machine." Plaintiff admitted knowledge of the character of this machine, and therefore his possession of such a device, clearly contemplated in the contract, would have "run afoul of ORS 167.147"—as the trial court put it.[8]

The "free play" or "upright" machines defendant worked on present a different problem. Although the last sentence of ORS 167.117(4) appears to exempt them from the definition of gambling devices, the Court of Appeals, in *State v. Wright,* 21 Or App 659, 666-67, 537 P2d 130 (1975), in affirming a conviction for the use of machines which were designed for free play use, but which were used for actual gambling with cash payoffs, stated:

"* * * The legislative history of ORS 167.117(4) persuades us that the legislature meant that: (1) free-play amusement devices are not *per se* gambling devices * * *, but (2) those machines which are *mechanically* free-play 'amusement devices' but *used* as gambling

---

[8]Plaintiff counters that his possession of this slot machine was not illegal, since it was intended to be used in Washington, where its use was legal. To this contention, we respond by quoting from *Hirschfeld v. McCullagh,* 64 Or 502, 516, 127 P 541 (1913):

"The law of the forum governs the remedy which will not be applied by the courts, if the contract, although valid elsewhere, is contrary to the public policy of this State as declared by its laws. * * *"

devices under ORS 167.117(4) are [illegal] * * *." (emphasis in original)

While there is no direct evidence of the actual use of the devices in question, in view of defendant's conviction for promoting gambling in connection with the use of these same machines, the trial judge could infer that they were so used. ORS 167.147(1)(b) requires, however, that this illegal use be known to a person charged with its violation. Defendant asserts that the trial court could have inferred such knowledge on plaintiff's part from plaintiff's having viewed these same machines during his July 4th visit.

■ The illegality of this contract may depend upon the technical application of statutory definitions; that it is against public policy is clearly demonstrable without resort to such technicalities. Article XV, § 4, of the Original Oregon Constitution (1859) provides:

> "Lotteries, and the sale of lottery tickets, for any purpose whatever, are prohibited, and the legislative assembly shall prevent the same by penal laws."

In *State v. Schwemler,* 154 Or 533, 536, 60 P2d 938 (1936), this court defined "lottery" in its constitutional sense as:

> "* * * any scheme whereby one, on paying money or other valuable thing to another, becomes entitled to receive from him such a return in value, or nothing, as some formula of chance may determine * * *."

A "pull tab" machine is clearly such a device, and its use violates the public policy of the state of Oregon. *Cf., Bernard v. Taylor,* 23 Or 416, 421, 31 P 968 (1893). In *McKee v. Foster,* 219 Or 322, 336, 347 P2d 585 (1959), we held that "free play" pinball machines are not lotteries in the constitutional sense. However, the reasoning of *State v. Wright, supra,* would apply to class such machines as lotteries if their *actual use* was within the above definition.

■ The contract in question, assuming it to embody the terms of plaintiff's Exhibit 1, while "illegal" in result,

was capable of being performed in a legal manner.[9] In such a case, more than proof of the objective illegality of the contract is required for defendant to deny enforceability. In *Seeck Mfg. Co. v. American Trust Co.,* 143 Or 314, 323, 20 P2d 1065, 22 P2d 325 (1933), we quoted approvingly from 6 R.C.L., § 101, at page 695:

> "Where an agreement is capable of being performed in a legal manner, the mere fact that one of the parties to the agreement intended to perform it in an illegal manner, will not preclude its enforcement. The illegal attempt that defeats a contract must be the common intent of both parties. If the purpose of either in making it, is lawful, and if he supposes the other's so to be, and contracts upon that supposition, his right to recover upon the contract after performance or tendering performance, is clear."

*See also N.W. Amusement Co. v. Aetna Co.,* 165 Or 284, 295, 107 P2d 110, 132 ALR 118 (1940).[10]

---

[9]Plaintiff's Exhibit 1 states that plaintiff agrees "to provide for a period of two (2) years on a full-time basis to [defendant], all his knowledge and expertise in the field of electronic components and in the management of an electronic components business."

[10]The application of this test is better understood by a brief review of the two Oregon cases in which it was previously applied. In *Seeck Mfg. Co. v. American Trust Co.,* 143 Or 314, 20 P2d 1065, 22 P2d 325 (1933), defendant trust company executed a contract with plaintiff corporation for the exclusive rights to sell the latter's stock in Oregon, reciting in the contract that it had obtained the required permit from the Oregon Corporation Commissioner to do so. Defendant, in fact, sold plaintiff's stock, collected money therefor but refused to remit said money to the plaintiff. Plaintiff sued for breach of contract, and defendant set up the defense of illegality in that defendant had in fact failed to obtain the required permit. Plaintiff's lack of knowledge of defendant's unilateral illegality rendered the contract, while objectively illegal, enforceable by the plaintiff.

In *N.W. Amusement Co. v. Aetna Co.,* 165 Or 284, 107 P2d 110, 132 ALR 118 (1940), plaintiff purchased a burglary insurance policy from defendant which covered illegal gambling devices. The devices were stolen, but defendant refused to pay their value, arguing an illegal contract. This court held that the rule cited in *Seeck* was applicable, and since both parties to the insurance contract had the common intent of protecting the illegal possession of gambling devices, the contract was unenforceable by either party. Thus, we see that the required intent is inferred from a party's knowledge of the true nature of the transaction involved.

The key to this "common intent," as the parties agreed, was plaintiff's knowledge at the time he entered into the contract in question. Knowledge by the plaintiff of defendant's illegal gambling activities involving electro-mechanical or electronic devices affords the trial court a permissible, if not irresistible, inference of plaintiff's intent to aid such activities. In addition, such knowledge would completely negate the requirement of the last sentence of the cited test—that plaintiff, at the time of contracting, supposed defendant's purpose to be lawful. Knowledge of facts and circumstances which would put a reasonable man on his inquiry is tantamount to knowledge of such facts as a reasonably diligent inquiry would reveal. *Ehler et ux v. Portland Gas & Coke Co.,* 223 Or 28, 46, 352 P2d 1102, 353 P2d 864 (1960).

Plaintiff denied subjective knowledge of the defendant's illegal gambling activities. However, there were abundant facts in evidence which would justify the trial court in drawing an inference of such knowledge. Plaintiff's whole career had been inextricably involved with the gambling business. There is no evidence that he had ever designed non-gambling "electronic components." Plaintiff met defendant through a mutual friend who was also in the business of manufacturing gambling devices. Before accepting employment, plaintiff was taken on a tour of defendant's upright device placements in Deschutes County. It was for the illegal use of these same devices that defendant was convicted of promoting gambling in the first degree. A permissible inference, unrebutted by any other evidence, is that defendant's machines were being used for illegal gambling purposes at that time. Plaintiff knew at the time of contracting that the "pull tab" machine he was hired to design was illegal in Oregon.

In addition, the manner in which plaintiff received his monthly salary is a fertile source of inference. The $1,000 cash payment "under the table" was, to say the

least, suspicious and yields a permissible inference that plaintiff had knowledge that something was not quite legitimate about the transaction. Again, plaintiff is charged with the knowledge of facts which his reasonable inquiry would have disclosed.

Moreover, it is the written contract, unenforceable per se for lack of defendant's signature but proffered by plaintiff as embodying the terms of their agreement, that gives an inference that plaintiff knew much more than he admitted of the real nature of defendant's business and plaintiff's contemplated involvement therein. The fourth clause of this contract gave plaintiff the right to purchase 120 shares of the stock of defendant's corporation (approximately 25% interest). This clause would be meaningless to plaintiff unless he was well aware of the true nature of defendant's business. In the sixth paragraph, the "covenant not to compete," plaintiff would be prohibited from being owner, manager or employe "in any other business of *similar nature*" to defendant's business. That the real nature of defendant's business was unknown to the plaintiff at the time of contracting would strain this court's credulity. However, in a case such as this, we need not reach such an independent conclusion. The trial court, in its memorandum opinion, stated, "There is no question in this court's mind, but that the plaintiff * * * knew that the defendant was conducting an illegal gambling operation." The evidence and inferences were conflicting. There was, however, sufficient evidence to support the trial court's findings of fact, and therefore we must affirm the trial court's judgment for the defendant.

Affirmed.