977 F.2d 1332
 24 Fed.R.Serv.3d 304, Prod.Liab.Rep. (CCH) P 13,342
 Bert E. INGRAM, Plaintiff-Appellee,
v.
ACANDS, INC.; Fibreboard Corp., Defendants,
and
Owens-Illinois, Inc., Defendant-Appellant.
Beulah M. BECKER, Personal Representative of the Estate of
Alfred E. Becker, Plaintiff-Appellee,
v.
OWENS-ILLINOIS, INC., Defendant-Appellant.
Beulah M. BECKER, Personal Representative of the Estate of
Alfred E. Becker, Plaintiff-Appellant,
v.
OWENS-ILLINOIS, INC., Defendant-Appellee.
Bert E. INGRAM, Plaintiff-Appellant,
v.
ACANDS, INC.; Fibreboard Corp., Defendants,
and
Owens-Illinois, Inc., Defendant-Appellee.
Bert E. INGRAM, Plaintiff-Appellee,
v.
ACANDS, INC., a Pennsylvania Corporation, et al., Defendant,
and
Fibreboard Corporation, Defendant-Appellant.
 Nos. 91-35117, 91-35216, 91-35330, 91-35331 and 91-35497.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 6, 1992.
Decided Oct. 21, 1992.
 
 Robert K. Udziela, Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, Or., for plaintiffs-appellees-cross-appellants.
 Larry C. Lowe, Morgenstein & Jubelirer, San Francisco, Cal., for defendant-appellant-cross-appellee.
 Thomas M. Peterson, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant-appellant-cross-appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before: GOODWIN, TANG and THOMPSON, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 Bert E. Ingram, a former insulator who suffered from asbestosis, and Beulah M. Becker, surviving wife of Alfred E. Becker who allegedly died from the effects of asbestosis, sued a number of asbestos manufacturers. Both Ingram and Becker included Owens-Illinois ("O-I") as a defendant in their respective lawsuits. Ingram also sued Fibreboard Corporation. Juries in the two cases[1] returned verdicts in favor of the plaintiffs.
 
 
 2
 On appeal, O-I challenges evidentiary rulings made by the district court in both cases and contends that substantial evidence does not support the juries' verdicts. It also contends it suffered prejudice in defending against liability in Becker's case when the district court let Becker's claim for punitive damages go to the jury, even though it had granted a directed verdict in favor of O-I on that claim.
 
 
 3
 Fibreboard challenges the district court's order in Ingram, holding it jointly and severally liable for all compensatory damages.
 
 
 4
 Ingram and Becker cross-appeal. Ingram argues that the district court erred in submitting to the jury the issue of his comparative fault. Becker makes the same argument as it pertains to her deceased husband. She also contends the district court erred in granting O-I's motion for a directed verdict on the punitive damage claim.
 
 
 5
 We have jurisdiction over all of the appeals and cross-appeals, because we hold that minute orders entered by the district court when it ruled on post-trial motions in the two cases, as well as subsequent orders entered after the court filed its formal opinions, are all dispositive orders which triggered 30-day appeal periods. Thus, no notice of appeal or notice of cross-appeal was untimely.
 
 
 6
 We affirm the judgments in both Ingram and Becker, except that in Ingram we vacate the portion of the judgment which imposed joint and several liability against Fibreboard.
 
 
 7
 * FACTS
 
 A. Ingram
 
 8
 Working as an insulator since 1955, Ingram was exposed to a number of products containing asbestos. Among the products to which he was exposed was "Kaylo," an asbestos-containing pipe covering and block manufactured for a time by O-I. Ingram also was a smoker.
 
 
 9
 In his suit against the asbestos manufacturers and their successors, Ingram alleged personal injuries based on strict liability and negligence. A jury found that Ingram suffered $527,000 in compensatory damages, and that his comparative fault was 45%. It apportioned the defendants' 55% relative fault among them as follows: Celotex Corporation, 7%; Fibreboard Corporation, 53%; O-I, 25%; and Manville Corporation Asbestos Disease Compensation Fund ("Manville"), 15%.[2] The jury also awarded Ingram $200,000 in punitive damages against O-I. The court determined that Fibreboard was jointly and severally liable for the full amount of the judgment, excluding the punitive damage award.
 
 B. Becker
 
 10
 Mrs. Becker's deceased husband worked as a marine machinist at Oregon Shipbuilding in Portland during World War II until 1946. He was exposed to numerous asbestos products, and eventually developed lung cancer and asbestosis.
 
 
 11
 The jury in Mrs. Becker's case awarded $104,431.92 in economic damages and $32,700 in noneconomic damages. It apportioned 34% of fault to the decedent Becker, 34% to Manville, 24% to Fibreboard Corporation, and 8% to O-I. The jury awarded punitive damages against Fibreboard and O-I in the amounts of $150,000 each, but these awards were set aside because the district court had previously granted Fibreboard's and O-I's motions for a directed verdict on the punitive damage claims.
 
 II
 DISCUSSION
 A. Appellate Jurisdiction
 
 12
 A timely notice of appeal is a jurisdictional requirement which cannot be waived by the parties. Allah v. Superior Court, 871 F.2d 887, 890 n. 1 (9th Cir.1989); Beaudry Motor Co. v. Abko Properties, Inc., 780 F.2d 751, 753-54 (9th Cir.), cert. denied, 479 U.S. 825, 107 S.Ct. 100, 93 L.Ed.2d 51 (1986). To be timely, a notice of appeal in a civil case must be filed in the district court "within 30 days after the date of entry of the judgment or order appealed from." Fed.R.App.P. 4(a)(1). However, when a party files a post-trial motion,
 
 
 13
 the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. A notice of appeal filed before the disposition of [such motion] shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above.
 
 
 14
 Fed.R.App.P. 4(a)(4).
 
 
 15
 A judgment or order is "entered" within the meaning of Rule 4(a) "when it is entered in compliance with Rules 58 and 79(a) of the Federal Rules of Civil Procedure." Fed.R.App.P. 4(a)(7). "Rule 58 requires that every judgment be set forth on a separate document, and Rule 79(a) details the civil docketing procedure to be followed by the district court clerk when entering the judgment." Beaudry, 780 F.2d at 754 (footnotes omitted).
 
 
 16
 In Ingram, the court entered judgment on the jury's verdict on October 30, 1990.[3] O-I filed post-trial motions on November 14, 1990. In Becker, the court entered judgment on November 1, 1990. O-I filed post-trial motions on November 16, 1990.
 
 
 17
 In both cases, the district court denied the post-trial motions and issued virtually identical minute orders. In Ingram, the minute order was entered January 14, 1991. It read:
 
 
 18
 Record of hearing Owens-Illinois motion for new trial, etc (350): Order DENYING; written opinion to follow.
 
 
 19
 A handwritten notation on the minutes states: "ntfd cnsl." O-I filed its notice of appeal on February 6, 1991. In Becker, the minute order was also entered January 14, 1991. It read:
 
 
 20
 Record of hearing deft. Owens-Illinois motion for new trial, etc (177): Order DENYING; written opinion to follow.
 
 
 21
 A handwritten notation on the minutes states: "ntfd." O-I filed its notice of appeal on February 6, 1991.
 
 
 22
 The district court thereafter filed a written opinion and separate order in Ingram. The order stated:
 
 
 23
 Defendant's motions for a new trial and judgment notwithstanding the verdict are denied.
 
 
 24
 IT IS SO ORDERED.
 
 
 25
 Dated this 12 day of February, 1991.
 
 
 26
 (signed) Owen M. Panner
 
 OWEN M. PANNER, United States
 District Court Judge
 
 27
 This order was entered on February 13, 1991. An identical order was filed in Becker. It was entered on February 12, 1991.
 
 
 28
 The extent of our jurisdiction over these appeals depends upon when the time to file notices of appeal, and notices of cross-appeal, began to run. This depends upon which orders are dispositive orders for appeal purposes.
 
 
 29
 If the minute orders entered January 14, 1991 are the only dispositive orders, then the 30-day appeal period began to run in both cases on that date. In Ingram, O-I's and Ingram's appeals would be timely,[4] and Fibreboard's would not be timely. In Becker, both O-I's appeal and Mrs. Becker's cross-appeal would be timely.
 
 
 30
 If the only dispositive orders are the district court's subsequent orders entered following its written opinions, then the 30-day period for appeal in Becker began to run on February 12, 1991, and in Ingram it began to run on February 13, 1991. In Ingram, Ingram's "cross-appeal" would be a timely appeal, and Fibreboard's "appeal" would be a timely cross-appeal. O-I's notice of appeal in Ingram would be premature, and therefore untimely.[5] In Becker, Mrs. Becker's "cross-appeal" would be a timely appeal.
 
 
 31
 The district court's initial minute orders denying the post-trial motions in both Ingram and Becker were entered January 14, 1991 on the docket sheets. In both cases, these minute orders were followed by written opinions, which in turn were followed by orders which also were docketed. There is no question that these subsequent docketed orders are dispositive orders that triggered 30-day appeal periods. The more difficult question is whether the previous minute orders entered January 14, 1991 were also dispositive orders that triggered 30-day appeal periods, notwithstanding entry of the subsequent orders.
 
 
 32
 In three previous cases, we have considered the question what constitutes a dispositive order to trigger the time within which to file a notice of appeal or other motion. See Carter v. Beverly Hills Sav. & Loan Ass'n, 884 F.2d 1186 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990); Beaudry, 780 F.2d 751; Calhoun v. United States, 647 F.2d 6 (9th Cir.1981), overruled on other grounds, Acosta v. Louisiana Dep't of Health & Human Res., 478 U.S. 251, 106 S.Ct. 2876, 92 L.Ed.2d 192 (1986).[6]
 
 
 33
 In Calhoun, in the portion that was not overruled by Acosta, we held that a document entitled "Minutes of the Court" did not constitute a dispositive order for purposes of Fed.R.App.P. 4(a). Calhoun, at 910. The district court's ruling was noted on the docket sheet as follows:
 
 
 34
 8-27-79 prcdgs on hrng on pltfs motn for correction of judgment; Motion argued and ordered denied.
 
 
 35
 Id. at 8. We emphasized that the minute entry did not purport to be an order itself but instead merely referred to an order. We also relied on the fact that there was no indication that the clerk had treated the minute entry as an order by mailing notice of entry to the parties, as required by Fed.R.Civ.P. 77(d). See id. at 8-9.
 
 
 36
 In Beaudry, we held that a minute order did constitute a dispositive order in compliance with Fed.R.Civ.P. 58 where the document (1) stated on its face that it was an order; (2) was mailed to the parties; and (3) was entered on the docket as an order. See Beaudry, 780 F.2d at 754-55. The minute order was file stamped and contained the words "IT IS ORDERED." In addition, the docket entry identified the document as an order:
 
 Date N.R. Proceedings
 
 37
 01/05 62 M/E (ACM): For reasons set forth in Dft resp to Pltf Mots for New
 
 
 38
 Trial and to Amd Cmplt, ORD that Pltf Mots are DENIED. (cc:
 
 Mandig, White, ACM)
 
 39
 Id. at 755. We distinguished Calhoun on the following basis:
 
 
 40
 The document at issue in Calhoun simply showed that proceedings were held and that the "[m]otion [was] argued and ordered denied." The document, although signed and docketed by the clerk, contained no filing or other stamp of the district court. Moreover, the clerk did not mail copies to the parties. This court concluded that the document failed to comply with Rule 58 because it did not constitute a separate "order" but instead appeared to be a notation of the court's proceedings.
 
 
 41
 Id. (citations omitted).
 
 
 42
 Carter involved the question whether the district court's decision dismissing the case by reason of settlement was properly entered in compliance with Fed.R.Civ.P. 58. The district court's decision was embodied in a document entitled "Civil Minutes--General." The minutes set forth the following entry:
 
 PROCEEDINGS: Pre Trial Conference
 
 43
 Counsel not present. Counsel inform that this matter has settled. Court dismisses the action by reason of settlement and retains jurisdiction over the matter for 60 days to vacate this order and to reopen the action upon a showing of good cause that the settlement has not been completed and further litigation is necessary. Entered ___ JS-6.
 
 
 44
 Carter, 884 F.2d at 1188. These minutes were entered on the docket sheet as follows:
 
 
 45
 3-25-85 sb 18. crt dism actn reason of settlmnt & retn jurdctn 60 reopen if settlmnt not completed (ENT 3-26-85) MD JS 6 Mld cpys
 
 
 46
 Id. We held that the minute entry did not satisfy Rule 58 and thus did not start the one-year time period for filing a motion under Fed.R.Civ.P. 60(b). Id. at 1189.
 
 
 47
 The majority in Carter reasoned that the minute entry was not dispositive because it was not signed by the clerk who prepared it and because it merely represented the minutes of action taken at a pretrial conference and thus was not a separate document. See id. at 1189-90. The majority distinguished Beaudry as follows:
 
 
 48
 In that case, the district court issued a minute order which stated "IT IS ORDERED." That document was signed by a deputy clerk, entered in the civil docket book, and mailed to counsel. In this case, we have civil minutes which do not bear the imperative "IT IS ORDERED," and are not signed by the deputy clerk who prepared them. Although the civil minutes were entered in the civil docket book, they do not constitute a separate order nor were they entered as an order. This case is thus controlled by Calhoun rather than Beaudry Motor.
 
 
 49
 Id. at 1190 (citation omitted).
 
 
 50
 From the foregoing cases the following propositions appear:
 
 
 51
 1. A minute order may constitute a dispositive order for notice of appeal purposes if it (1) states that it is an order; (2) is mailed to counsel; (3) is signed by the clerk who prepared it; and (4) is entered on the docket sheet. Carter; Beaudry.
 
 
 52
 2. If an oral ruling, or a minute order that does not meet the requirements of Carter and Beaudry, is not followed by a properly entered dispositive order, this court will have appellate jurisdiction when a notice of appeal is filed any time after the district court's ruling.[7] Carter; Allah; Calhoun. See also McCalden v. California Library Ass'n, 955 F.2d 1214, 1217-19 (9th Cir.1990), cert. denied, sub nom., Simon Wiesenthal Center for Holocaust Studies v. McCalden, --- U.S. ----, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992); Vernon v. Heckler, 811 F.2d 1274, 1276-77 (9th Cir.1987).
 
 
 53
 In addition,
 
 
 54
 3. If an oral ruling on a post-trial motion, or presumably a minute order that resolves a post-trial motion but does not meet the Beaudry and Carter requirements, is followed by a properly entered dispositive order, only the latter order triggers the Fed.R.App.P. 4(a) appeal period and any notice of appeal filed before entry of that order is premature and untimely.[8] Acosta; Hollywood v. City of Santa Maria, 886 F.2d 1228, 1231 (9th Cir.1989).
 
 
 55
 The Ingram and Becker cases now before us present a fourth scenario in which we hold initially that the minute orders entered in both cases on January 14, 1991 meet the requirements of Beaudry and Carter. In both cases, the "Civil Minutes" documents state on their faces that they are indeed orders. The words "Order DENYING, written opinion to follow" is a statement that the minute orders are orders and that separate opinions spelling out the district court's reasoning will be filed later. In both cases, the minute orders were signed by the clerk, mailed to counsel, and entered on the civil docket sheets.
 
 
 56
 We have previously stated that the subsequent orders entered after the written opinions were filed are also dispositive orders. The question then becomes: When two dispositive orders are entered, one after the other, does one nullify the other for purposes of filing a timely notice of appeal? We hold it does not. The validity of one does not establish the invalidity of the other. Moreover, if a district court enters two dispositive orders, each of which is sufficient to trigger the time for appeal under Fed.R.App.P. 4(a)(4), a party should not have to run the risk that the order he may choose to appeal from may not be the same order a court of appeals decides he should have chosen. Cf. Bankers Trust Co. v. Mallis, 435 U.S. 381, 385, 98 S.Ct. 1117, 1120, 55 L.Ed.2d 357 (1978) (per curiam) (In the context of Fed.R.Civ.P. 58's separate entry requirement, Rule 58 was "intended to avoid the inequities that were inherent when a party appealed from a document or docket entry that appeared to be a final judgment of the district court only to have the appellate court announce later that an earlier document or entry had been the judgment and dismiss the appeal as untimely.").
 
 
 57
 We conclude that all notices of appeal and cross-appeal were timely filed, and we have jurisdiction of all of the appeals and cross-appeals in both Ingram and Becker. We now consider the merits of the two cases.B. Ingram
 
 
 58
 Under the federal standard of review, a jury's verdict will not be set aside unless it is clearly erroneous. Kabatoff v. Safeco Ins. Co., 627 F.2d 207, 209 (9th Cir.1980). Although Oregon applies the "substantial evidence" test to support a jury verdict, "the state and federal standards are basically equivalent." Id. Accordingly, we need not decide which standard is appropriate in this case. Id.
 
 
 59
 Substantial evidence means "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." Sanders v. Parker Drilling Co., 911 F.2d 191, 193-94 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). When there is sufficient evidence before the jury on a particular issue, and the instructions of law on the issue are correct, the jury's verdict will not be disturbed. Id. at 194.
 
 
 60
 O-I argues that substantial evidence does not support a finding that O-I's Kaylo was a substantial factor in causing Ingram's injury or that 25% of the defendants' liability is attributable to it. O-I also argues that the district court erroneously excluded expert testimony and that the jury's award of punitive damages is not supported by clear and convincing evidence.
 
 
 61
 Ingram contends that the district court erred in submitting the question of his comparative fault to the jury. We reject all of these arguments.
 
 1. Substantial Evidence--Causation
 
 62
 Over the many years of Ingram's exposure to asbestos-containing products, he was exposed to O-I's Kaylo for only three months. This was sufficient, however, to provide substantial evidence of causation.[9]
 
 
 63
 Causation under Oregon law refers to causation in fact, that is to say, whether someone examining the event without regard to legal consequences would conclude that the allegedly faulty conduct or condition in fact played a role in its occurrence. "Causation in fact" is unrelated to "proximate" or "legal" cause, concepts which have been discarded by [the Oregon Supreme Court].
 
 
 64
 Sandford v. Chevrolet Division, 292 Or. 590, 642 P.2d 624, 633 (1982) (citations and internal quotations omitted).
 
 
 65
 A reasonable jury could have found that Ingram's three-month exposure to Kaylo played a role in the occurrence of his asbestosis. Medical evidence adduced at trial indicated that exposure to asbestos causes asbestosis, and that the amount of injury increases with greater exposure.
 
 
 66
 2. Allocation of 25% of Defendants' Liability to O-I
 
 
 67
 Because there is substantial evidence of Ingram's exposure to O-I's Kaylo, the question then becomes whether the jury reasonably could have found that O-I was 13.75% responsible for Ingram's injuries based upon three months exposure to O-I's Kaylo. This percentage comes from multiplying the percentage of the defendants' total liability (55%) by the percentage of O-I's liability among the defendants (25%).
 
 
 68
 O-I argues that the only sensible method for allocating liability among the defendants is physical causation. It contends the evidence reveals that O-I's product could not have physically caused 13.75% of Ingram's injuries. We reject this argument.
 
 
 69
 Under Oregon law, fault is apportioned not by an allocation of physical causation, "but rather [by] allocating fault, which cannot be scientifically measured." Id. 642 P.2d at 628 (quoting Victor Schwartz, Comparative Negligence 276 (1974)).
 
 
 70
 First, if the plaintiff's behavior which was one cause of the injury is alleged to have been negligent or otherwise "fault," it is to be measured against behavior that would have been faultless under the circumstances. The factfinder is to determine the degree to which the plaintiff's behavior fell short of that norm and express this deficit as a numerical percentage, which is then applied to diminish the recoverable damages. There necessarily must be some comparable assessment of the fault attributable to defendants as a departure from the norm invoked against them (which, in products liability, will involve the magnitude of the defect rather than negligence or moral "blameworthiness" ) in order to determine which is greater. In this comparison, the benchmark for assessing a defendant's fault for marketing a product which is dangerously defective in design, manufacture, or warning is what the product should have been without the defect. The benchmark for the injured claimant's fault is conduct which would not be unlawful or careless in any relevant respect.
 
 
 71
 Id. at 633-34 (footnote omitted and emphasis added); see also Dahl v. BMW, 304 Or. 558, 748 P.2d 77, 83-84 n. 5 (1987).
 
 
 72
 O-I acknowledges that Sandford and Dahl prohibit apportioning liability on the basis of physical causation between a negligent plaintiff and a manufacturer of a defective product, but it argues that the Sandford/Dahl prohibition does not apply to a jury's apportionment of liability among defendant manufacturers. We disagree. Oregon Revised Statute § 18.445 requires apportioning liability among joint tortfeasors on the basis of "their relative degrees of fault or responsibility." As "fault" is defined under Oregon law, physical causation cannot be considered. See Sandford, 642 P.2d at 628. Thus, so long as substantial evidence supports the jury's allocation of 13.75% of the "fault" to O-I, its verdict must stand.
 
 
 73
 Each of the defendants' products contained asbestos, making each product defective. Some products contained more asbestos than others, the composition of asbestos in some was different from others, and the warnings, when given, were different. O-I's Kaylo contained asbestos, produced some asbestos dust during use, and contained no warning. Under these circumstances, we cannot say that the jury's allocation of 13.75% of fault to O-I is unsupported by substantial evidence.
 
 3. Exclusion of Witness Testimony
 
 74
 We review a district court's evidentiary rulings for abuse of discretion. Rogers v. Raymark Indus., 922 F.2d 1426, 1429 (9th Cir.1991). "In the area of admission of expert testimony, we will uphold the district court's decision unless that decision is 'manifestly erroneous.' " Id.
 
 
 75
 O-I argues that the district court erred in excluding part of the proffered expert testimony of Dr. Douglas Fowler, an industrial hygienist. The court excluded the testimony because O-I failed to comply with the court's standing order which required the parties to disclose in advance the specific opinion of each witness.
 
 
 76
 O-I's witness statement for Dr. Fowler's testimony reads:
 
 
 77
 Dr. Fowler will testify as to the plaintiff's total asbestos exposure and will determine the percentage contribution from Owens-Illinois, Inc. asbestos containing products, based on his analysis of the plaintiff's work locations, his job duties and years of alleged exposure.
 
 
 78
 The district court ruled the witness statement for Dr. Fowler's testimony was not sufficiently specific under its standing order. O-I argues the court's standing order was unclear. The order was sufficiently clear, however, for the lead counsel for the defendants successfully to object at trial to the testimony of plaintiff's first expert witness as being outside the scope of the court's requirements for witness statements. This exclusion took place three days before Dr. Fowler was to testify. Further, other witness statements prepared by O-I contain the kind of detail required by the district court's order.
 
 
 79
 O-I argues that it could not have provided the kind of detail the court required, because Dr. Fowler's testimony was to be based upon information gleaned from the testimony of others at the time of trial regarding Ingram's exposure to different asbestos products. The district court considered this argument, but concluded that O-I should have obtained this information from Ingram's deposition which was taken years before.
 
 
 80
 We cannot say the district court abused its discretion in restricting the scope of Dr. Fowler's testimony.
 
 4. Punitive Damages
 
 81
 Under Oregon law, punitive damages are not recoverable in a products liability case "unless it is proven by clear and convincing evidence that the party against whom punitive damages is sought has shown wanton disregard for the health, safety and welfare of others." Or.Rev.Stat. § 30.925(1).
 
 
 82
 Dr. David Ozonoff, a medical historian, testified that asbestos manufacturers knew of the health risk of asbestos from the 1930s. Another witness, Dr. Barry Castleman, testified specifically about O-I's knowledge of the dangers of asbestos beginning in the 1930s and 1940s and that its knowledge increased in the 1950s. In addition, documents known as the Saranac Lake documents reveal that O-I was advised that Kaylo was capable of causing asbestosis. Indeed, O-I admits these documents informed O-I that Kaylo products "were a potentially hazardous material." This evidence, coupled with the failure of O-I to place warnings on Kaylo packages after learning of the danger of asbestos, constituted sufficient clear and convincing evidence of wanton conduct to support the jury's $200,000 award of punitive damages against O-I.
 
 5. Ingram's Comparative Fault
 
 83
 Ingram contends that because the defendants presented no evidence causally relating his cigarette smoking to his asbestosis, and because he sought damages only for asbestosis, the district court erred in submitting the issue of his comparative fault to the jury. This argument fails because Ingram sought general damages for his total lung impairment, not damages solely resulting from asbestosis.
 
 
 84
 At trial, the evidence presented by Ingram's expert witness indicated that his condition was the result of the combined effect of cigarette smoking and asbestos. The synergistic effect of cigarette smoke and asbestos in increasing Ingram's cancer risk was also established. See also Rogers, 922 F.2d at 1428 (expert indicates that cigarettes and asbestos "work together to increase the absorption of carcinogens"). In his brief, Ingram states that "the evidence supports a conclusion that [his] total lung impairment was impacted by his cigarette smoking."[10]
 
 
 85
 Ingram also argues that the district court erred in submitting the issue of his comparative fault to the jury because the jury was instructed to award damages only for injuries caused by the defendants. According to Ingram, allowing the jury also to consider his comparative fault allowed a double reduction of his damages.
 
 
 86
 Ingram misreads the instructions. In part, the instructions provided:
 
 
 87
 Plaintiff and defendants have each alleged that the injury was caused by the other's negligence. This requires instructing you on the law of comparative negligence. If you find that both defendant and plaintiff were negligent in any respect which was a cause of the damage complained of, then you should compare the negligence of plaintiff to the negligence of defendant.
 
 
 88
 . . . . .
 
 
 89
 [I]f plaintiff's negligence is 50 percent or less, then he is entitled to a verdict in his favor. Do not reduce the amount of plaintiff's damages, if any. The judge will reduce the amount awarded to plaintiff by the percentage of plaintiff's negligence, if any.
 
 
 90
 If you find from the evidence and the instructions that plaintiff is entitled to prevail, then it becomes your duty to decide whether plaintiff has been damaged, and if so the amount of his damage.
 
 
 91
 . . . . .
 
 
 92
 If you find that plaintiff is entitled to damages, then it is your duty to determine the amount of general damages that he has suffered because of any injuries which have been caused by the fault or negligence of defendants.
 
 
 93
 Ingram argues the last sentence of the quoted instructions, containing the phrase, "caused by the fault or negligence of defendants," directed the jury to award damages only for those injuries caused by the defendants. We disagree. The instructions as a whole do not convey this meaning. See Kaiu v. Raymark Indus. (In re Hawaii Federal Asbestos Cases), 960 F.2d 806, 814 (9th Cir.1992) (jury instructions examined as a whole for prejudicial error).
 
 C. Becker
 
 94
 O-I argues that substantial evidence does not support the jury's verdict that O-I products were a substantial factor in causing Becker's injury, that 8% of the total fault was attributable to O-I, and that economic damages exceeded $20,431.92 (the stipulated amount of Becker's medical and burial expenses). Mrs. Becker argues that the district court erred in submitting the issue of her husband's comparative fault to the jury. We reject all of these arguments.
 
 1. Substantial Evidence
 
 95
 Like the evidence tying O-I's Kaylo to Ingram, the evidence tying O-I's Kaylo to Becker is somewhat scant. There was no testimony regarding Becker's personal exposure to Kaylo; there was only testimony that Kaylo was present on the ships upon which Becker worked.
 
 
 96
 Two witnesses identified Kaylo as present at Becker's worksite. Joseph Churchill, a former insulation contractor at Oregon shipyards, testified that Kaylo was used at Oregon shipyards, although "we didn't fool with that very much. It was too expensive--labor cost was too great on it." Wayne Adams, a former purchasing agent at the shipyards, testified that he might have seen Kaylo used on the ships in the shipyard, or perhaps saw the name "Kaylo" on a carton, "but it ... wasn't a major factor in the volume of goods."
 
 
 97
 O-I first argues that this evidence is insufficient to support a verdict against it, because there was no particularized proof that Becker came into contact with Kaylo. At best, according to O-I, the evidence established merely that Kaylo was present at Becker's workplace. O-I urges us to apply the so-called "frequency, regularity, proximity" test and require particularized proof of Becker's exposure to Kaylo. See Blackston v. Shook & Fletcher Insulation Co., 764 F.2d 1480 (11th Cir.1985).
 
 
 98
 Some courts have adopted the "frequency, regularity, proximity" test, but others have held that so long as a plaintiff introduces evidence to show that the product of a particular defendant was present at the worksite and thus could be said to have contributed to the asbestos exposure of which he complains, he can recover from the defendant. See, e.g., In re Hawaii Federal Asbestos Cases, 960 F.2d at 817-818 (applying Hawaii recognized public policy); Lockwood v. AC & S, Inc., 109 Wash.2d 235, 744 P.2d 605, 612-13 (1987).
 
 
 99
 Although O-I argues that the "weight of national authority" requires adopting the more stringent "frequency, regularity, proximity test," our task is to determine whether Oregon courts would adopt the test. As discussed in section B.1 above, Oregon has discarded the concepts of proximate cause and legal cause. Sandford, 642 P.2d at 633. The more stringent test suggested by O-I has no place in a jurisdiction such as Oregon which looks only to cause-in-fact or "whether someone examining the event without regard to legal consequences would conclude that the allegedly faulty conduct or condition in fact played a role in its occurrence." Id. Under Oregon law, once the plaintiff presents evidence that the defendant's asbestos was present in the workplace, it is the jury's task to determine if the presence of that asbestos played a role in the occurrence of the plaintiff's injuries.
 
 
 100
 O-I's fallback argument is that no substantial evidence supports Mrs. Becker's contention that Kaylo was present in the shipyards where her husband worked, because Churchill's testimony and her husband's testimony were impeached by inconsistent deposition testimony. We reject this argument. The argument challenges the credibility of witnesses' testimony. Such a challenge involves questions necessarily resolved by the jury. Sanders, 911 F.2d at 194.
 
 2. Allocation of 8% of Liability to O-I
 
 101
 The jury verdict form, Question 4, asked the jury "[w]hat is the percentage of each party's fault or negligence?" The jury determined that O-I was 8% at fault. As noted above, there was substantial evidence of product defect and causation. There was also substantial evidence that 8% of the fault was attributable to O-I. The jury's allocation of fault will not be disturbed.
 
 3. Economic Damages
 
 102
 The jury awarded Mrs. Becker $32,700 in noneconomic damages and $104,431.92 in economic damages. Of the $104,431.92 in economic damages, only $20,431.91 was readily identifiable as the stipulated amount of Becker's medical and burial expenses. O-I argues that no substantial evidence supports the remaining $84,000 of economic damages, which it contends was not objectively verifiable as required by Oregon's Revised Statute § 18.560:
 
 
 103
 "Economic damages" means objectively verifiable monetary losses including but not limited to reasonable charges necessarily incurred for medical, hospital, nursing and rehabilitative services and other health care services, burial and memorial expenses, loss of income and past and future impairment of earning capacity, reasonable and necessary expenses incurred for substitute domestic services, recurring loss to an estate, damage to reputation that is economically verifiable, reasonable and necessarily incurred costs due to loss of use of property and reasonable costs incurred for repair or for replacement of damaged property, whichever is less.
 
 
 104
 Or.Rev.Stat. § 18.560(2)(a).
 
 
 105
 We reject O-I's argument because there was sufficient evidence under Oregon's wrongful death statute to support the $84,000 portion of the jury's verdict.
 
 
 106
 Mrs. Becker testified that she nursed her husband when he was in ill health and that he was unable to perform, as he previously had, his domestic services of mowing the lawn and trimming the hedges. O-I speculates that the jury awarded Mrs. Becker $1,000 per month for the final 84 months of Becker's life to compensate for these services. It argues that no objectively verifiable evidence supports these items.
 
 
 107
 We need not decide whether the evidence of Mrs. Becker's nursing care and her husband's inability to perform household gardening services was sufficient under the "objectively verifiable" standard of Oregon Revised Statute § 18.560(2)(a) to support the $84,000 award. This is a wrongful death case. Damages recoverable for wrongful death are spelled out in Oregon Revised Statute § 30.020, which provides in pertinent part:
 
 
 108
 (2) In an action under this section damages may be awarded in an amount which:
 
 
 109
 (a) Includes reasonable charges necessarily incurred for doctors' services, hospital services, nursing services, other medical services, burial services and memorial services rendered for the decedent;(b) Would justly, fairly and reasonably have compensated the decedent for disability, pain, suffering and loss of income during the period between injury to the decedent and the decedent's death;
 
 
 110
 (c) Justly, fairly and reasonably compensates for pecuniary loss to the decedent's estate;
 
 
 111
 (d) Justly, fairly and reasonably compensates the decedent's spouse, children, stepchildren, stepparents and parents for pecuniary loss and for loss of the society, companionship and services of the decedent; and
 
 
 112
 (e) Separately stated in finding or verdict, the punitive damages, if any, which the decedent would have been entitled to recover from the wrongdoer if the decedent had lived.
 
 
 113
 Or.Rev.Stat. § 30.020(2)(a)-(e).
 
 
 114
 The pecuniary loss described in sections 30.020(2)(c) and (d) has been interpreted broadly to include more than actual monetary loss in a wrongful death case. See Prauss v. Adamski, 195 Or. 1, 244 P.2d 598, 608 (1952). We conclude the $84,000 is supported by substantial evidence.
 
 4. Becker's Comparative Fault
 
 115
 In arguing that the court erred in letting the issue of her deceased husband's comparative fault (based on his cigarette smoking) go to the jury, Mrs. Becker raises the identical arguments raised by Ingram. The jury instructions on comparative fault in Becker's case differ slightly from the comparative fault instructions in Ingram's, but our reason for upholding the district court's decision to allow the jury to consider Mrs. Becker's deceased husband's comparative fault is the same as discussed in section B.5 above with regard to the Ingram case. The instructions as a whole properly set forth the law of comparative fault.
 
 5. Punitive Damages
 
 116
 Although the district court granted O-I's motion for a directed verdict on the punitive damage question, it nonetheless allowed the jury to consider whether or not to award punitive damages. The court stated that it did so to eliminate the need for a new trial on the issue of punitive damages if this court reversed its directed verdict. The jury awarded Mrs. Becker $150,000 in punitive damages. This award was nullified, however, by the directed verdict.
 
 
 117
 Mrs. Becker argues there was clear and convincing evidence of O-I's wanton conduct to support an award of punitive damages, and thus it was error for the district court to enter a directed verdict on this issue. We disagree. The significance of the danger of asbestos to end users of Kaylo like Becker became clear to O-I only after 1946, the last date of Becker's exposure to Kaylo. Some of the Saranac Lake documents discussed in section B.4 above were available before 1946, but the pre-1946 documents do not provide clear and convincing evidence that during or before 1946 O-I acted wantonly by manufacturing and distributing Kaylo without warnings. On this issue the evidence permits only one reasonable conclusion, and thus the directed verdict was properly granted. See In re Hawaii Asbestos Cases, 960 F.2d at 816.
 
 
 118
 O-I argues the district court committed prejudicial error when it submitted the punitive damages claim to the jury after it directed a verdict excluding such damages. O-I contends that "[g]iven the flimsy product identification testimony against [O-I], the jury was obviously influenced in its decision on liability by having to decide the weightier issue of punitive damages." O-I's Opening Brief at 27.
 
 
 119
 O-I cites no authority to support this argument. This is not surprising, because the argument is meritless. As we have previously stated, there was substantial evidence to support the jury's finding of liability, as well as its allocation of 8% of the fault to O-I. There is nothing in the record to suggest the jury did not follow the court's instructions to decide the question of O-I's liability based on the evidence presented at trial. O-I's argument is based solely on its speculation that there was some spillover effect on the jury's resolution of the liability issue because the jury was given instructions on the punitive damage issue. We will not indulge in such speculation.
 
 D. Fibreboard's Joint and Several Liability
 
 120
 In its appeal in Ingram, Fibreboard argues the district court erred by holding it jointly and severally liable. We agree.
 
 
 121
 As discussed previously, the jury allocated 45% of the fault to Ingram and 55% of the fault collectively to the defendants. The court then required the jury to allocate liability among the defendants. The jury apportioned 53% of the defendants' liability to Fibreboard. It divided the other 47% of the defendants' overall liability among Celotex, O-I and Manville. Thus, Fibreboard's fault is 53% of the 55% of defendants' liability, or 29.15% of total fault.[11]
 
 
 122
 Under former Oregon Revised Statute § 18.485, which is applicable to this case,
 
 
 123
 Each joint tortfeasor defendant is jointly and severally liable for the entire amount of the judgment awarded a plaintiff, except that a defendant whose percentage of fault is less than that allocated to the plaintiff is liable to the plaintiff only for that percentage of the recoverable damages.
 
 
 124
 Because Ingram's percentage of total fault (45%) is greater than Fibreboard's percentage of total fault (29.15%), the district court erred in imposing joint and several liability against Fibreboard.
 
 
 125
 As the legislative history of the former statute reflects, "a defendant whose percentage of fault is less than plaintiff's (but who is nevertheless liable because of the combined fault of all the defendants is greater than the plaintiff's fault) is liable to the plaintiff only for that percentage of plaintiff's recoverable damages." Minutes, Oregon House Judiciary Committee, Appendix G, p. 2 (May 28, 1975).
 
 
 126
 Ingram argues the district court correctly determined that Fibreboard's fault was greater than his fault, because "plaintiff's 'fault' (45%) as it relates to a perfect plaintiff, is still less than Fibreboard's 'fault' (53%) as Fibreboard's fault relates to a perfect product." This argument fails. The 53% the jury attributed to Fibreboard reflects the jury's view of Fibreboard's fault among the defendants, or 29.15% of the overall fault. As Fibreboard points out, Ingram's proposed interpretation would mean the jury apportioned more than 100% fault in this case, an unsupportable result.
 
 III
 CONCLUSION
 
 127
 The judgments in Ingram and Becker are affirmed, except the portion of the judgment in Ingram imposing joint and several liability against Fibreboard is vacated. The Ingram case is remanded to the district court with instructions to enter judgment against Fibreboard in the amount of $122,827.50 (plus interest), with Fibreboard not jointly and severally liable for the damages assessed against the other defendants.
 
 
 128
 Fibreboard shall recover its costs on appeal from Ingram. Ingram shall recover 60% of his costs on appeal from O-I. Becker shall recover 60% of her costs on appeal from O-I. The parties shall otherwise bear their own costs on appeal.
 
 
 129
 AFFIRMED in part, judgment VACATED in part, and REMANDED for correction of the judgment in Ingram against Fibreboard.
 
 
 
 [1]
 Ingram and Becker each filed more than one lawsuit against the manufacturers. For convenience, we treat as one unit those cases filed by Ingram and as another those cases filed by Becker. At times we refer to these separate units as "the two cases" or "both cases" or "each case."
 
 
 [2]
 The defendants' 55% share of the $527,000 in compensatory damages equaled $289,850. This was reduced by $58,100 as a result of settlement amounts paid by others, leaving $231,750 which was apportioned among the defendants according to their individual percentages of fault
 
 
 [3]
 The following are the relevant events and dates:
 Event Ingram Becker
Judgment entered: 10/30/90 11/01/90
O"I files post-trial motions: 11/14/90 11/16/90
Court issues minute order: 01/07/91 01/07/91
Minute order entered: 01/14/91 01/14/91
O"I files NOA: 02/06/91 02/06/91
Court issues new order: 02/12/91 02/12/91
New order entered: 02/13/91 02/12/91
Plaintiff cross-appeals: 02/20/91 02/20/91
Fibreboard files NOA: 02/27/91 N/A
O"I files Civil Appeals
Docketing Statement in Circuit: 03/01/91 03/26/91
 
 
 [4]
 Ingram's cross-appeal (filed 2/20/91) would be timely, because it was filed within 14 days after the date of O-I's notice of appeal (filed 2/6/91). See Fed.R.App.P. 4(a)(3). The same is true of Mrs. Becker's cross-appeal
 
 
 [5]
 We do not reach the question whether O-I's civil appeals docketing statement filed March 1, 1991 in Ingram and March 26, 1991 in Becker could be treated as the "functional equivalent" of a notice of appeal
 
 
 [6]
 In all three cases we also considered whether a district court minute order satisfied the requirements of Fed.R.Civ.P. 58. The focus of the inquiry in each case, however, was whether the document was a dispositive order sufficient to trigger the time period for filing an appeal or other motion
 
 
 [7]
 The absence of a "separate entry" of the district court's order on the civil docket sheet violates Rules 58 and 79(a). However, "the existence of a properly entered separate judgment is not a prerequisite to appellate jurisdiction under 28 U.S.C. § 1291. The parties may waive the separate judgment requirement by failing to object on that ground to the taking of [an] appeal." Allah, 871 F.2d at 890 n. 1 (internal citation omitted)
 
 
 [8]
 When no post-trial motion has been filed, "a notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after such entry and on the day thereof." Fed.R.App.P. 4(a)(2). "Rule 4(a)(4) [which deals with post-trial motions] constitutes an exception to the general rule that a notice of appeal filed after announcement of an order but before its entry in the docket will be deemed timely filed." Acosta, 478 U.S. at 254, 106 S.Ct. at 2277
 
 
 [9]
 Ingram argues he was exposed to O-I's Kaylo when he worked at Owens-Corning Fiberglas ("OCF"). However, Ingram's social security records reveal that Ingram was not employed at OCF before April 1958. Because O-I sold its Kaylo manufacturing division to Owens-Corning in April 1958, any exposure to Kaylo at OCF may not be attributed to O-I
 Ingram also contends he worked with the Kaylo material at OCF for a "substantial portion" of the 1950s and 1960s. Ingram argues that his testimony to this effect supports a conclusion that his exposure to Kaylo extended for three years (1955 to 1958), and not three months. This argument is disingenuous. Ingram's testimony specifically referred to social security records, and those records reveal he did not work for OCF until after April 1958.
 
 
 [10]
 The damages for Ingram's lung impairment could not be apportioned between his cigarette smoking and his exposure to asbestos. Cf. Protectus Alpha Navigation Co. v. North Pacific Grain Growers, Inc., 767 F.2d 1379, 1383 (9th Cir.1985) (the principles of comparative negligence are not applicable when damages can be apportioned to separate causes)
 
 
 [11]
 Expressed as individual percentages of total fault, the jury apportioned liability as follows:
 Party Percentage
Plaintiff 45.00
Fibreboard 29.15
O"I 13.75
Celotex 3.85
Manville 8.25
----------------------
Total 100.00
 ----------
 ----------